**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| JEREL JONES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 24-cv-2022 |
| v. | ) | |
| | ) | |
| THE VILLAGE OF FLOSSMOOR, ILLINOIS, | ) | |
| BRIDGET A. WACHTEL, in her individual capacity, | ) | |
| | ) | JURY DEMANDED |
| Defendants. | ) | |

**COMPLAINT**

JEREL JONES (Jerel or Plaintiff), by and through his undersigned counsels, Robert W. Fioretti, Esq., and Cass T. Casper, Esq., DISPARTI LAW GROUP, P.A., states as follows for his Complaint against the Village of Flossmoor, Illinois and Bridget A. Wachtel (Wachtel) in her individual capacity (collectively hereinafter Defendants).

**NATURE OF THE CASE**

1. This case involves the Village of Flossmoor's (Village) termination of its first Black Police Chief, Jerel, as an act of race discrimination and retaliation.

2. On October 5, 2023, Jerel complained to Flossmoor's Mayor, Michelle Nelson, about disparate treatment he was received from Defendant Wachtel.

3. Wachtel responded to Jerel's concerns with a campaign of retaliation culminating in his termination on or about March 7, 2024.

4. Wachtel's race-based discriminatory conduct toward Jerel is shown in this Complaint through three of Wachtel's self-contradictory and hyperbolic performance Memos to Jerel that criticize seemingly every aspect of his performance, his speech and speech patterns, his initiative and non-initiative, and Wachtel's view that, in her own words, Jerel, a Black man, must:

4   Chief Jones was advised to build interdepartmental relationships. He was directed to solicit counsel and assistance—and <u>accept</u> it. Chief Jones has not improved in this area.

5.   In the context of the Memoranda as a whole, Jerel must do exactly as Wachtel or other White Administrators say he must do and he must diminish his own thoughts, beliefs, and ideas, and accept Wachtel's.

6.   The outright race-based animus of Wachtel towards Jerel can be seen through a close examination of these three Memoranda[1].

7.   The Memoranda directly evidence what Jerel complains of here: <u>Wachtel imposed a master-slave dynamic between her and Jerel and, if he did not fit himself into that expected dynamic, he could not be Police Chief.</u>

8.   Wachtel's behavior is race discrimination in an insidious form, *to wit*, the emasculation and evisceration of any form of Blackness out of Jerel and insistence that he reconstitute as White. Then, and only, then, as White-Black Police Chief will he meet Wachtel's demands and succeed.

9.   Wachtel's race-based animus can be seen, too, in her castigating the Black Deputy Chief, Taylor, throughout her Memoranda on the basis of the same kind of false or exaggerated, and hyper-micro-managerial expectations that she imposed on Jerel.

10.  Wachtel has not imposed the same kind of phony job performance standards on White and Hispanic Department Heads that she has imposed on Jerel leading to his termination.

11.  Indeed, Wachtel admitted to Jerel during his six month performance review that she had never treated other Department Heads the same way she was treating him.

12.  Jerel seeks all available relief, including reinstatement, back pay and damages, and an

---

[1] Jerel consents to the Village releasing the Memoranda; he does not include them in full as Exhibits because he is concerned Defendant Wachtel will claim they contain safety-sensitive information and further fault him for releasing them. The excerpts included in this Complaint do not contain safety-sensitive information.

injunction against the Village requiring it to send the Village Manager and all other administration officials to comprehensive racial sensitivity training immediately to prevent any comparable action from happening to anyone else again.

13. Jerel also demands a public apology from the Mayor and the Village for the harms alleged herein.

## JURISDICTION AND VENUE

14. Jurisdiction of this Court arises under 28 U.S.C. §§ 1331, 1337, pursuant to the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution via 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and pursuant to 42 U.S.C. § 1981.

15. Venue is proper under 28 U.S.C. § 1391 because the events and omissions giving rise to the claims herein have occurred in this judicial district, and because Defendant Flossmoor maintains its place of operation within this judicial district.

## PARTIES

16. Jerel is a legal adult, a resident of this judicial district, and formerly employed as the Chief of Police with Flossmoor, Illinois

17. Defendant Wachtel is a legal adult, on belief a resident of this judicial district, and the duly-appointed Village Manager for the Village of Flossmoor, Illinois.

18. Defendant Wachtel is sued in her individual capacity only.

19. At all times, Defendant Wachtel acted under color of law.

20. Defendant Wachtel has no law enforcement background.

21. Defendant Wachtel is the Village Manager, but, in fact, operationally is in charge of the Village and controls the Mayor, Michelle Nelson, who does what Wachtel says, takes her recommendations, and generally has ceded operational control of the Village to Wachtel.

22. Defendant Flossmoor, Illinois is a unit of local government with indemnification

3

obligations for wrongful acts committed by its officials, such as Defendant Wachtel *See* 745 ILCS § 10/1-202 and § 9-102.

23. Defendant Flossmoor is sued in its capacity employer and as indemnitor of Defendant Wachtel.

## FACTS COMMON TO ALL COUNTS

24. Jerel is the first Black Police Chief of the Village of Flossmoor, Illinois in its history, beginning his career there and sworn in March 27, 2023.

25. Until his termination on or about March 7, 2024, Jerel was the only Black Department Head in the Village of Flossmoor.

26. On or about October 5, 2023, Jerel met with Mayor Michelle Nelson to discuss concerns he had about how he was being treated more severely and held to a higher standard of performance by Defendant Wachtel than the Village's White and Hispanic Department Heads.

27. Specifically, Jerel advised the Mayor that Village Manager Wachtel was engaging him in overbearing scrutiny, micromanagement, baseless criticism, personally attacking criticisms, and generally holding him to a standard of performance that would be unachievable by anyone.

28. Jerel's meeting with the Mayor carried obvious racial overtones in that he is the only Black Department Head, all other Department Heads are White or Hispanic, he is the first Black Police Chief in Flossmoor's history, and he was complaining to Mayor Nelson about his disparate and targeted treatment at the hands of Wachtel.

29. Indeed, Jerel stated to the Mayor during this conversation that he felt he was being disadvantaged and held to a higher performance standard than his non-Black peers because of his race.

30. Mayor Nelson did not conduct any investigation to Jerel's knowledge.

31. To the contrary, on October 5, 2023, Wachtel sent Jerel a four-page, single-spaced

4

Memorandum nitpicking Jerel's actions and plans with respect to police security at the Flossmoor Festival 2023.

32. Wachtel's Memorandum argued with seemingly everything Jerel did at the Festival, imposed unrealistic and unachievable requirements that were contrary to Jerel's judgment as Chief of Police, and was so micro-managerial and dictatorial that no reasonable Chief of Police or any Department Head could have complied with it.

33. For example, the October 5, 2023 Memorandum includes this Paragraph:

4. As we pointed out at the debriefing meeting, not all the ICS forms were in the IAP. You informed staff that those forms were in the command van. You further stated that the police would use one set of ICS forms and fire would use another set of forms. Use of two sets of forms is unconventional to our understanding of unified command. Even assuming the use of two sets of forms was acceptable, not having them with the IAP runs contrary to common sense.

34. In this paragraph, Wachtel criticizes Jerel's decision to use a separate form from that used in the Fire Department.

35. These forms were in place in the event they were needed to activate a major incident, which never occurred and the forms were not needed anyway.

36. No one had ever raised this issue with Jerel, it is petty, trivial, and micro-managerial, and this criticism has no purpose other than to find fault with every aspect of Jerel's performance.

37. Indeed "common sense" to Jerel in running a Police Department was to use a Police Department form, but Jerel's Black version of "common sense" was not up to muster with Wachtel's White version of "common sense."

38. The October 5, 2023 Memorandum also includes this Paragraph:

2. It was learned that you relied on your cell phone to communicate with private security, Metra Police and the Cook County Sergeant. Their lack of ability to monitor and communicate via radio with police placed the residents and all members of the police and security team in a position of vulnerability. The standard approach to unified command is that all parties can communicate and monitor activity at the same time, so information is received in real time, not with the added delay of having to call on a cell phone.

39. Wachtel's criticism of the Police Chief using his cell phone to communicate is contrary to accepted Police Department practice in modern times where ranking officers use their cell phones all the time to communicate departmental matters. Indeed, radio communications can often be difficult to understand, and usually no more than one person can communicate at a given time per channel, so the use of the cell phone in modern policing is not only accepted within police command standards, but sensible and widespread.

40. Jerel talked via phone and text message during the Festival, including with Wachtel and other Department Heads throughout the Festival, and it worked just fine.

41. Wachtel is neither a police officer, nor does she have police background, and the above examples from her October 5, 2023 Memorandum to Jerel are inflated, hyperbolic, and after-the-fact quarterbacking are, in fact, not hindsight, but micromanagement in the extreme.

42. So too, Wachtel's statements in the Memorandum regarding Jerel's handling of the Flossmoor festival are false, half-truth, gross exaggerations, leave out key facts, and are deliberately written to tarnish Jerel, rather than present a true and accurate picture of the state of security as the Flossmoor Festival.

43. Wachtel's campaign against Jerel got worse.

44. On October 18, 2023 Wachtel sent Jerel a Memorandum containing this Paragraph:

10. **Initiative, Quality and Quantity of Work:** While you have done a good job of moving some initiatives forward, I am concerned that you over-delegate. Knowing that your command staff is learning as well, you risk the loss of quality in the product when you take a hands-off approach. Two examples include the Fest IAP and the Camera RFP. Both products, which were composed by your staff, showed a lack of job knowledge with respect to administration. In the case of the Camera RFP project, that has been fumbled by the Police Department for years, you should have a heightened sense of participation. This again goes back to your over-reliance on the Command staff. In addition, fulfilling staff vacancies and responding to staffing issues needs to be addressed with a sense of urgency. This includes the presence and productivity of the sergeants. You heard directly from union leadership about their frustration with the sergeants' lack of assistance in responding to calls and managing the daily workload. You should embrace the opportunity to re-establish the expectations of the sergeants' performance.

45. In this Paragraph, Wachtel is now concerned about Jerel "over-delegating" and having an "over reliance on the Command staff." Yet, carefully read, this Paragraph does not actually state any issue that has been caused by Jerel delegating. In fact, the last sentence criticizes the Sergeants for not providing as much assistance to officers as they could – but how is this a problem of "delegating"?

46. Jerel's concern about cameras, too, is out of due regard for the safety of the Village, but also to ensure the police force is acting appropriately when responding to the public. Wachtel, however, evidently does not share Jerel's concern for widespread cameras that could help capture inappropriate police conduct, if it occurred. Jerel states that Wachtel does not share his concern for holding police officers to the highest standards as demonstrated through her opposition to widespread cameras.

47. Wachtel, too, goes so far as to criticize Jerel's speaking abilities in language that seemingly wants Jerel to speak and answer questions exactly as Ms. Wachtel wants him to answer, with no due regard for the fact that people speak differently, as follows:

9. **You do not speak plainly or answer questions directly.** You talk *around* questions— or offer a piece of information that *you* want to share, information that is often not relevant to the discussion. Too often, your responses only complicate issues. During recent conversations about the DRACA contract costs, you responded by providing information on what everyone else is paying and not answering the question. In a discussion about monitoring the children's area of the fest, you responded with concerns about sex offenders. In multiple examples including discussions related to the Fest and social media, when you do not agree with what you hear you tend to have a circular conversation, use misdirection, and catastrophize to defend your position. This disintegrates your credibility with your peers and takes away from the discussion. Your peers and I have training in emergency management, relevant experience in the field, and knowledge that may be useful to your Department. This kind of behavior needs to be adjusted immediately to foster a collaborative environment with your peers.

48. Indeed, it is hard to imagine how anyone could speak correctly with the above criticism.

49. Then Wachtel issues a February 22, 2024 Memorandum with this Paragraph:

c. You do not come prepared with accurate or all relevant information to meetings involving budgetary decisions. As an example, in our budget meetings, you made a pitch to move to the Axon body worn camera (BWC) system immediately because we are the only E-Com community not on Axon. You presented that this would be a cost of over $65,000 annually, which is $35,000 more than we budget annually. There is a legitimate argument for moving to Axon, but these decisions are not taken lightly. When I informed you that E-Com advised that our move to Axon did not need to be timed to any decisions at E-Com, you reinforced your position that the move was urgent; you referenced a fear of dropped video frames from our current BWC system and then cited that E-Com was moving toward enhanced GIS positioning elements that you implied would only be available with Axon products. Your position involved scare tactics and misinformation. Upon further discussion with E-com, it was learned that there is no requirement for an E-com community to subscribe to any particular body worn camera system. In addition, you referenced needing 25 cameras to cover every officer and CSO in a mass critical incident. This would be a large increase from the 15 we currently have deployed. While having enough equipment and even spares is important, you did not provide any comps or operational protocol that would indicate the need for 25 BWC. Instead, you continue to catastrophize and use misinformation as a means of defending your position, distracting from meaningful conversation and delaying decisions.

50. In this Paragraph, Wachtel recounts how the Chief raised an issue with how the Village's body worn camera program is out of sync with neighboring jurisdictions and then criticizes how he spoke and addressed her, once again – "[y]our position involved scare tactics and intimidation" and that he was "distracting from meaningful conversations."

8

51. Jerel is the Police Chief talking about a wildly-important issue – how body worn cameras are operated in Flossmoor. Yet, Wachtel, once again, does not like how he speaks or his forcefully defending an idea.

52. Too, like Jerel's concern for more stationary cameras, Wachtel again opposes improvements in body worn camera systems that have revolutionized police accountability. Wachtel is not only opposing Jerel's support of improving body-worn camera systems, via this Paragraph she has now demonstrated an aversion to camera improvements in the Village that are the crux of the public's, including the Black public's trust of the police.

53. Jerel's explanation for Wachtel's hypercritical fixation on his speech and manner of communication is that, fundamentally, it involves a White-Black power dynamic of an embedded White Administrator not liking how the Black man is talking.

54. Carefully read, all of Wachtel's Memoranda have this tone to them, are personally derogatory toward Jerel and parse nearly every one of Jerel's actions to such an extent that the Memoranda reveal that there is more going on here than just management oversight; rather, Jerel states that Wachtel treated him in this fashion because she does not like that he is Black, does not like that a Black man takes initiatives, does not like that a Black man might speak differently or use different speech patterns and tones than her view of how a Black man should speak, and wants to continue to remind the Black man that he is subservient to the White power structure imposed and enforced by Wachtel.

55. Here is another example from the February 22, 2024 Memorandum:

d. You did not take Assistant Village Manager Jonathan Bogue's feedback regarding proceeding delicately with requesting police access to SD161 camera system. Jonathan has been working with both school districts to obtain public safety camera access in the case of an emergency. Jonathan expressed to you that the School District had concerns with giving Police full access to their cameras in non-emergency situations, and Jonathan informed you that he would take the lead with securing camera access. This approach was made clear to you. Instead of adhering to the plan set forth by us, you proceeded on your own accord to ask for access to SD161's system in a meeting with Dr. Smith, which has halted our progress in achieving this important objective. This is another example of not listening to management's direction.

56. With respect to this Paragraph, Wachtel once again expressed offense that Jerel did not lay down to the demands of a White man – the Assistant Village Manager Jonathan Bogue.

57. But look at the substance of this Paragraph: Wachtel is criticizing the Chief of Police for simply wanting to gain access to the camera system in the School District!

58. In the age of school shootings, what in the world is wrong with the Chief of Police gaining access to school district cameras? If anything, the school district should be ready and willing to make the school camera systems available to the local police department at the drop of a hat and Wachtel should be supporting Jerel on this.

59. Except, of course, for the upshot of this Paragraph: Wachtel is more concerned that Jerel took initiative outside of the White power structure she requires to be kept in place.

60. Here is another example from the February 22, 2024 Memorandum:

e. At a recent Community Relations Commission meeting, the Police Department was asked to report on the progress of the Department's implementation of the Commission's recommendations following the forum. The AVM directed you to provide a brief report as the Commission had other business to discuss. You talked for 53 minutes about Police Department updates, well outside the directive of follow up from the forum. When questioned by the AVM on your verbose report to the Commission, you asked the AVM if he could sit down ahead of future commission meetings to receive more direction. However, in this case, direction was clearly given as to the parameters of the presentation, and you failed to follow a simple instruction to be brief. Asking for more direction on this matter is a waste of time for all involved.

61. Here, Jerel gave a comprehensive update about Police Department matters at a Community Relations Commission meeting, and Wachtel says it was too long. From Wachtel's perspective, the issue here, really, is that when a Black man speaks, it better be short and controlled. She was offended that Jerel talked for 53 minutes about important police matters.

62. Indeed, Jerel was lauded by others at the Commission meeting for his comprehensive discussion.

63. Next, the following Paragraph is contained in Wachtel's February 22, 2024 Memorandum:

4  **Chief Jones was advised to build interdepartmental relationships**. He was directed to solicit counsel and assistance—and <u>accept</u> it. Chief Jones has not improved in this area.

You have not built solid relationships with your peers in other Village departments.

a.  You do not take ownership of high level projects and defer such projects to others in the organization. You are not prepared for projects and employ catastrophizing tactics. In our October 18 review, the Mayor and I referenced the upcoming camera RFP project as an opportunity to build camaraderie with other departments, specifically Assistant Village Manager Jonathan Bogue and Public Works Director John Brunke. You and Deputy Chief submitted the first draft of the RFP tailored to a preferred vendor. To allow competitive bidding as required by law, Assistant Village Manger Bogue edited the work to encompass an opportunity for more vendors to submit a proposal. When it came time for the walk through with the contractors, you and DC Taylor extemporaneously added camera locations to the scope of the project during the walk through; those camera locations were not documented in the scope of the RFP. Additionally, you and Deputy Chief justified a multitude of cameras using catastrophizing methods. Everything from cameras to account for accidental discharge of weapons in the Fire Training room to multiple cameras in the police lobby in case someone is hiding in a window alcove. Finally, Deputy Chief had submitted language in the published RFP that the current vendor had gone out of business. This fact was wrong, which was discovered when a rep from that vendor was present for the walk through. In the end, one vendor replied to the RFP on time and the one proposal that came in was three times what the Village had budgeted. The amount of cameras requested by you and Deputy Chief was surely part of the reason that the only bid submitted came in at three times the budgeted amount. Now, the process needs to start again, which causes frustration for all.

64. Most tellingly, Wachtel **bolds** and <u>**underlines**</u> her expectations that Jerel ask others for permission on how to do his job, and that he **accept** it!

65. This Paragraph on its face reveals what Wachtel really thinks about Jerel: he is incapable of making decisions on his own, he needs to be subservient to others (really, subservient to Wachtel), and, the kicker: **he must do as Wachtel says he must do** and he must diminish his own thoughts, beliefs, and ideas, and **accept, slavishly, Wachtel's.**

66. However, looking at Paragraph 4(a) in its entirety, what Wachtel is really complaining about is that the Chief and Deputy Chief suggest that there are other locations in the Village that should have cameras installed. So what? That does not mean the Village needs to go along with it, but to put this issue in Jerel's February 22, 2024 Memorandum as a criticism of Jerel? Why?

67. Wachtel does not stop her criticism of Jerel, but she also goes after the performance of the other Black man in the Police Department, Deputy Chief Taylor:

**3.** **Chief Jones was advised that he was not addressing performance issues concerning his command staff and he continues to not correct shortcomings of his staff.**

Specifically, you have not addressed the performance issues and concerns related to Deputy Chief Taylor. Upon your hire, you were advised that we had concerns about Deputy Chief Taylor's ability to carry out his responsibilities, given his disengagement following his service as Acting Chief. You assured us that you would manage DC Taylor's performance. This latest situation with the Deputy Chief clearly failing to fulfill his responsibilities involves his ability to administer background checks on Village employees. To perform such checks Deputy Chief Taylor needs to have access to certain databases. A review shows that Deputy Chief Taylor had not set up his login through the Illinois State Police since former DC Wagner left in 2022, and not until questioned by the Manager's Office was any meaningful action taken to resolve the matter. Moreover, Taylor attempted to push the responsibility of background checks onto other Village Departments by saying that they could set up and manage their own accounts. Your intervention into the matter on January 18 and your attempt to justify Deputy Chief Taylor's incompetency clearly shows an unwillingness on your part to manage your personnel. In addition, the Village did not have access to the CHIRP system since mid-November which is another vital database for the Village. Deputy Chief Taylor's failure to perform has impacted multiple departments and poorly reflects not only Taylor's credibility, dependability and effectiveness as a teammate but likewise on the Department as a whole. Naturally, departments now think they cannot rely on you.

68. This Paragraph not only calls Deputy Chief Taylor "incompetent," itself wildly offensive, but then it recounts that Jerel even tried to intervene "on January 18" to fix the issue but, evidently, Jerel can do not right by Wachtel.

69. The Memorandum carries on to criticize Deputy Chief Taylor's "poor performance," "lack of understanding," and then criticizes Jerel's defending Deputy Chief Taylor.

70. In other words, Wachtel now has a pattern of targeting the Black leaders in the Village.

71. At the end of the day, Wachtel's Memoranda carry on and on and on in this dictatorial, micro-managerial, hyper-critical fashion toward Jerel (and Deputy Chief Taylor) and reveal that she has a set of performance expectations for Jerel that are unachievable and by which Jerel could never, ever, in any universe or time, do right by Wachtel.

13

72. Wachtel, too, has not treated other Department Heads in this fashion. Specifically, she has not subjected White Department Heads to the same set of false, hyperinflated, and micro-managerial performance expectations.

73. Indeed, on information and belief, Wachtel has not treated any White Department Head in the manner she has treated Jerel as outlined herein.

74. The only explanation for Wachtel's disparate and discriminatory treatment of Jerel is anti-Black animus by Wachtel toward Jerel (and Deputy Chief Taylor).

### COUNT 1 – FOURTEENTH AMENDMENT EQUAL PROTECTION DEPRIVATION BASED ON RACE (BLACK) VIA 42 U.S.C. § 1983
(Plaintiff v. Defendant Wachtel)

75. Plaintiff restates, realleges, and incorporates by reference Paragraphs 1 through 74 as if fully restated herein.

76. The Fourteenth Amendment of the United States Constitution provides that "No State. . .shall deny to any person within its jurisdiction the equal protection of the laws."

77. This jurisdiction has recognized that the Equal Protection Clause prohibits denial of equal protection of the laws in the employment context on the basis of race, and that qualified immunity does not attach to race-based discriminatory conduct by government officials. *See Singmuongthong v. Brown*, 77 F.4th 503, 506 (2023) (recognizing that the Equal Protection clause prohibits race discrimination in employment and may be enforced via 42 U.S.C. § 1983).

78. Here, Plaintiff has suffered two adverse employment actions by Wachtel: (i) Wachtel's imposition of a heightened set of performance standards on Jerel and her uncontrolled and unhinged campaign of micromanagement of him, and (ii) Jerel's termination by Wachtel and Nelson on or about March 7, 2024.

79. Wachtel was motivated by race in her imposition of a heightened set of performance standards on Jerel and her uncontrolled and unhinged campaign of micromanagement of him.

14

80. Wachtel was motivated by race in her decision to terminate him.

81. While Mayor Nelson formally made the final decision to terminate Jerel, she did so as Wachtel's cat's paw because her decision was made entirely on Wachtel's input and recommendation. *See Smith v. Bray*, 681 F.3d 888 (7th Cir. 2012) (recognizing the cat's paw theory under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983).

82. Wachtel was the true decisionmaker in Jerel's termination because the Mayor relied on her input and recommendation, and did not perform any independent assessment of Wachtel's recommendation and input, but "rubberstamped" the decision.

83. As a result of Wachtel's action, Jerel has suffered job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

84. Wachtel's actions are the cause-in-fact of Jerel's job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

85. Wachtel's actions are the proximate cause of Jerel's job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Honorable Court enter judgment in his favor, and against Defendants, and enter and order all appropriate relief, to include back pay and back benefits as allowed by law, compensatory damages in an amount to be determined at trial, make whole relief for all losses resulting from the unlawful discrimination alleged herein, injunctive relief requiring Defendants to cease and desist from committing race discrimination, reasonable attorneys' fees and litigation costs, pre-judgment interest, and all other available and appropriate relief.

### COUNT 2 – RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981 VIA 42 U.S.C. § 1983
(Plaintiff v. Defendants Wachtel and Flossmoor)

86. Plaintiff restates, realleges, and incorporates by reference Paragraphs 1 through 74 as if

fully restated herein.

87. Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

88. With respect to Section 1981 claims against the government, they are brought via 42 U.S.C. § 1983. *See Campbell v. Forest Preserve District of Cook County, Illinois*, 752 F.3d 665, 670 (7th Cir. 2014).

89. Individual liability may be established under 42 U.S.C. § 1981.

90. To state a claim for race discrimination under 42 U.S.C. § 1981, an employee must plead that (1) he was a member of a protected class; (2) he met the legitimate expectations of his employer; (3) he suffered an adverse employment action; and, (4) similarly situated employees who were not members of his protected class were treated more favorably. *See Vega v. Chicago Park District*, 165 F.Supp.3d 693, 700-701 (N.D. Ill. 2016); *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 591-92 (7th Cir. 2008).

91. Courts in this judicial district "generally have applied the same *prima facie* requirements to discrimination claims brought under Title VII and Section 1981. *See e.g., Alexander v. Wis. Dep't of Health & Family Servs.,* 263 F.3d 673, 682 (7th Cir.2001) (applying same standard to Title VII and section 1981 discrimination claims); *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 940 (7th Cir.1996) ("Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical."); *Randle v. LaSalle Telecomms., Inc.,* 876 F.2d 563, 568 (7th Cir.1989) ("It is well settled that the methods and order of proof applicable to a claim of disparate treatment under Title VII are equally availing under § 1981."); *see*

*also Patterson,* 491 U.S. at 186, 109 S.Ct. 2363 (applying *McDonnell Douglas* framework to section 1981 claims). *See Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd,* 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008).

92. Jerel is a member of a protected class, *to wit,* he is Black.

93. Here, Plaintiff has suffered two adverse employment actions by Wachtel: (i) Wachtel's imposition of a heightened set of performance standards on Jerel and her uncontrolled and unhinged campaign of micromanagement of him, and (ii) Jerel's termination by Wachtel and Nelson on or about March 7, 2024.

94. Wachtel was motivated by race in her imposition of a heightened set of performance standards on Jerel and her uncontrolled and unhinged campaign of micromanagement of him.

95. Wachtel was motivated by race in her decision to terminate him.

96. While Mayor Nelson formally made the final decision to terminate Jerel, she did so as Wachtel's cat's paw because her decision was made entirely on Wachtel's input and recommendation. *See Smith v. Bray*, 681 F.3d 888 (7th Cir. 2012) (recognizing the cat's paw theory under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983).

97. Wachtel was the true decisionmaker in Jerel's termination because the Mayor relied on her input and recommendation, and did not perform any independent assessment of Wachtel's recommendation and input, but "rubberstamped" the decision.

98. As a result of Wachtel's action, Jerel has suffered job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

99. Wachtel's actions are the cause-in-fact of Jerel's job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

100. Wachtel's actions are the proximate cause of Jerel's job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Honorable Court enter judgment in his favor, and against Defendants, and enter and order all appropriate relief, to include back pay and back benefits as allowed by law, compensatory damages in an amount to be determined at trial, make whole relief for all losses resulting from the unlawful discrimination alleged herein, injunctive relief requiring Defendants to cease and desist from committing race discrimination, reasonable attorneys' fees and litigation costs, pre-judgment interest, and all other available and appropriate relief.

### COUNT 3 – RETALIATION FOR REPORTING RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981 VIA 42 U.S.C. § 1983
(Plaintiff v. Defendants Wachtel and Flossmoor)

101.    Plaintiff restates and incorporates by reference Paragraphs 1 through 74 of this Complaint as if fully realleged in this Count.

102.    Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981.

103.    The Seventh Circuit has interpreted Section 1981 to allow for claims of retaliation. *See, e.g.*, *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 398 (7th Cir. 2007) ("section 1981 encompasses the 'termination of contracts,' and there can be no doubt that a retaliatory discharge is indeed a termination of the employment contract.").

104.    Courts in this judicial district "generally have applied the same prima facie requirements to discrimination claims brought under Title VII and section 1981. *See e.g., Alexander v. Wis. Dep't of Health & Family Servs.,* 263 F.3d 673, 682 (7th Cir.2001) (applying same standard to Title VII and section 1981 discrimination claims); *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 940 (7th

18

Cir.1996) ("Although section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical."); *Randle v. LaSalle Telecomms., Inc.,* 876 F.2d 563, 568 (7th Cir.1989) ("It is well settled that the methods and order of proof applicable to a claim of disparate treatment under Title VII are equally availing under § 1981."); *see also Patterson,* 491 U.S. at 186, 109 S.Ct. 2363 (applying *McDonnell Douglas* framework to section 1981 claims). *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), *aff'd*, 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008).

105.     In this case, Jerel engaged in protected activity when he reported Wachtel's race discriminatory behavior to Mayor Nelson on October 5, 2023.

106.     Mayor Nelson took no action to rectify Wachtel's discriminatory behavior.

107.     Plaintiff has suffered two adverse employment actions by Wachtel: (i) Wachtel's imposition of a heightened set of performance standards on Jerel and her uncontrolled and unhinged campaign of micromanagement of him, and (ii) Jerel's termination by Wachtel and Nelson on or about March 7, 2024.

108.     Wachtel was motivated by retaliation in her imposition of a heightened set of performance standards on Jerel and her uncontrolled and unhinged campaign of micromanagement of him.

109.     Wachtel was also motivated by retaliation in her decision to terminate him.

110.     While Mayor Nelson formally made the final decision to terminate Jerel, she did so as Wachtel's cat's paw because her decision was made entirely on Wachtel's input and recommendation. *See Smith v. Bray*, 681 F.3d 888 (7th Cir. 2012) (recognizing the cat's paw theory under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983).

111.     Wachtel was the true decisionmaker in Jerel's termination because the Mayor totally

relied on her input and recommendation, and did not perform any independent assessment of Wachtel's recommendation and input, but "rubberstamped" the decision.

112.  As a result of Wachtel's action, Jerel has suffered job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

113.  Wachtel's actions are the cause-in-fact of Jerel's job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

114.  Wachtel's actions are the proximate cause of Jerel's job loss, reputational damage, salary and benefits losses, and extreme emotional distress.

WHEREFORE, for the foregoing reasons, Plaintiff requests that this Honorable Court enter judgment in his favor, and against Defendants, and enter and order all appropriate relief, to include back pay and back benefits as allowed by law, compensatory damages in an amount to be determined at trial, make whole relief for all losses resulting from the unlawful discrimination alleged herein, injunctive relief requiring Defendants to cease and desist from committing race discrimination, reasonable attorneys' fees and litigation costs, pre-judgment interest, and all other available and appropriate relief.

## COUNT 4 – INDEMNIFICATION
(Plaintiff v. Defendant Flossmoor)

115.  Plaintiff restates and incorporates by reference Paragraphs 1 through 74 of this Complaint as if fully realleged in this Count.

116.  Illinois statute provides that a local public entity such as Flossmoor, Illinois is obligated to assume financial responsibility for the actions committed by its officials or employees such as Wachtel. *See* 745 ILCS §§ 10/1-202, 10/2-302, and 10/9-102.

117.  Defendant Flossmoor, Illinois is obligated to assume such financial responsibility for Defendant Wachtel.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order directing Flossmoor, Illinois to pay, indemnify, and assume financial responsibility for the actions and/or omissions committed by Defendants for the harms they caused to Plaintiff alleged herein.

**JURY DEMANDED ON ALL COUNTS**

*Dated March 11, 2024*

Respectfully submitted,

**JEREL JONES**

*/s/ Robert W. Fioretti*
*/s/ Cass T. Casper*
By:_____
One of Plaintiff's Attorney

*Robert W. Fioretti, Esq.*
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext.
E: rfioretti@dispartilaw.com

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: ccasper@dispartilaw.com